**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALVIN T. RICCIARDI, on behalf of :
himself and all others similarly situated, :
          :  CIVIL ACTION
     Plaintiff, :
          :  No. 03-5285
  v.        :
          :
ELECTRONIC DATA SYSTEMS :
CORPORATION     :
          :
     Defendant. :

**Green, S.J.**                **February 20, 2007**

## MEMORANDUM

   Presently pending are the Parties' Cross-Motions for Summary Judgment.  For the

reasons stated below, Plaintiff's Motion for Summary Judgment will be denied, and Defendant's

Motion for Summary Judgment will be granted.

**I. Factual and Procedural Background**

   In his Complaint, Plaintiff alleges that he was a victim of age discrimination when

terminated by Defendant.  Specifically, Plaintiff claims that the process used by Defendant to

assess and rank employees disparately impacted older employees, and led to Plaintiff's

termination.[1]  This matter is before the Court on summary judgment to determine whether the

release of Plaintiff's discrimination claims against Defendant under the Age Discrimination in

Employment Act (hereinafter "ADEA"), 29 U.S.C. §621 et seq., was valid under the ADEA, as

---

[1]Upon joint stipulation, this matter was placed in suspense pending the outcome of <u>Smith v. City of Jackson</u>, 544 U.S. 228 (2005), where the Supreme Court held that an employee can bring a disparate impact claim under the Age Discrimination in Employment Act.  After <u>Smith</u> was decided, this matter was taken out of suspense and discovery completed to determine the validity of a release signed by Plaintiff.

amended by the Older Workers Benefit Protection Act (hereinafter "OWBPA), 29 U.S.C. §626(f).

Plaintiff alleges the following facts in his Motion. Plaintiff began working for Defendant in March, 1997. In 2000, Defendant announced a Performance Management Process (hereinafter "PMP") as a method for assessing and ranking employees. Under the PMP, which had approval from the higher members of Defendant's management, each Team Leader of Defendant ranked subordinates individually, then Team Leaders met with their immediate supervisors to discuss the rankings. In 2001 the PMP was revised, applied system wide, and as applied allegedly caused older employees to receive lower performance rankings. Plaintiff alleges that because of his PMP ranking, and as part of a national rolling reduction in force (hereinafter "RIF"), he was terminated in April 2002.

When terminated, Plaintiff executed a document (hereinafter "the Release") waiving his right to sue Defendant pursuant to various statutes including the ADEA in consideration for a severance package (hereinafter "Package"). In an effort to comply with ADEA requirements, Plaintiff was given a Workforce Listing, which disclosed the job code and age of everyone terminated in the Application Services Organization April 2002 Workforce Reduction. The Workforce Listing also included a disclosure of the employees terminated who received the option of waiving their right to sue under the ADEA in exchange for a severance package.

In his Motion, Plaintiff seeks a declaration that the Release he executed is invalid under the OWBPA. Count II of Plaintiff's Complaint alleges that Defendant obtained the release by concealing the true RIF numbers from him. Plaintiff seeks summary judgment on Count II, as well as Defendant's affirmative defense based on the Release.

In Plaintiff's Motion, Plaintiff asserts that the Release is invalid because it does not comply with the ADEA, as amended by the OWBPA. Specifically, Plaintiff alleges that the Release is invalid for the following reasons: (1) the Workforce Listing does not include information about the other employees allegedly terminated as part of the national rolling RIF; (2) Plaintiff was not informed of the criteria upon which his selection for termination was based; (3) the Release is not written in a manner calculated to be understood by the average individual eligible to participate; and (4) the Workforce Listing is not written in a manner calculated to be understood by the average individual eligible to participate. As such, Plaintiff asserts that his waiver of his right to sue the Defendant under the ADEA is invalid.

Defendant relies upon the following. Plaintiff worked in an EDS "solution center" during his entire EDS employment. In 2002, Plaintiff worked as an Information Analyst in the Pennsylvania Solution Center, which was part of the EDS Applications Services Center. Different EDS organizations engaged in workforce activities at various times. Plaintiff was terminated as part of the Application Services Organization's April 2002 Workforce Reduction, designed to reduce expenses of the unit. As a part of the termination, Defendant gave Plaintiff a Workforce Listing that disclosed whether each person terminated in Application Services would receive the option of accepting a severance package in exchange for a waiver of the right to sue under the ADEA. Plaintiff was also given a copy of EDS' Severance Plan and Summary Plan to explain the criteria used to decide which terminated employees were selected to receive the Package. Defendant points out that Plaintiff consulted with an attorney prior to signing the Release. Plaintiff used most of the required forty-five (45) day period to consider the Release, before signing the Release. Defendant also notes that Plaintiff did not revoke the Release within

the required seven (7) day revocation period.  Thereafter, Plaintiff received and cashed a severance check tendered by Defendant.

In its Motion, Defendant asserts that the Release executed by Plaintiff is valid because it complies with the OWBPA.  Defendant asserts that Plaintiff voluntarily waived his right to sue under the ADEA and this case should be dismissed.

## II. Discussion

### A. Legal Standard for Summary Judgment

Summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2025 (1986).  Material facts are those facts whose determination will affect the outcome of the lawsuit.  Id.

### B. The ADEA and the OWBPA

The OWBPA was passed in 1990 as an amendment to the ADEA.  The OWBPA provides that all waivers of the right to file suit under the ADEA must be "knowing and voluntary."  29 U.S.C. §626(f)(1) (2007).  In order for a waiver to be knowing and voluntary, it must, at a minimum, satisfy all of the listed statutory requirements set forth in 29 U.S.C. §626(f)(1). Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 288 (3d Cir. 2003).

Specifically, a waiver satisfies the statutory requirements in the OWBPA if: (1) it is part of an agreement between the terminated employee and the employer that is written in a manner

4

calculated to be understood by such terminated employee, or by the average individual eligible to participate; (2) it specifically refers to rights or claims under the ADEA; (3) it does not waive rights or claims that may arise after the date the waiver is executed; (4) it waives rights or claims in exchange for consideration in addition to anything of value to which the individual is already entitled; (5) it advises the terminated employee to consult an attorney prior to executing the waiver; (6) the terminated employee is given forty-five (45) days to consider the waiver, if the waiver is requested in connection with an employment termination program; and (7) the waiver provides for a period of at least seven (7) days after its execution during which the terminated employee may revoke the agreement.  29 U.S.C. § 626(f)(1)(A-G) (2007).  In addition to the aforesaid enumerated requirements, the OWBPA provides that:

> [I]f a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer ... informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program.

29 U.S.C. §626(f)(1)(H)(I) (2007).

The Equal Employment Opportunity Commission (hereinafter "the EEOC") regulations state that to satisfy the "manner calculated" requirement, waiver agreements must be drafted in plain language geared to the level of understanding of the individual party to the agreement, or individuals eligible to participate in a group termination plan.  29 C.F.R. §1625.22(b)(3) (2007).

A "program" exists when an employer offers additional consideration for the signing of a waiver pursuant to an exit incentive or other employment termination of two or more employees. 29 C.F.R. 1625.22(f)(1)(iii)(B) (2007).  "Other employment termination program" usually refers

to a group or class of employees who were involuntarily terminated and offered additional

consideration in return for their decision to sign a waiver of ADEA claims.  29 C.F.R.

1625.22(f)(1)(iii)(A) (2007).

      The information given by an employer must be given to each person in the decisional unit

who is asked to sign a waiver agreement.  29 C.F.R. 1625.22(f)(2) (2007).  A decisional unit is

that portion of the employer's organizational structure from which the employer chose the

persons who would be offered consideration for the signing of a waiver and those who would not

be offered consideration for the signing of a waiver.  29 C.F.R. 1625.22(f)(3)(i)(B) (2007).  The

determination of the appropriate population of the decisional unit must be made on a case-by-

case basis.  29 C.F.R. 1625.22(f)(3)(ii)(A) (2007).

      An involuntary termination program in a decisional unit may take place in successive

increments over a period of time.  29 C.F.R. 1625.22(f)(4)(vi) (2007).  In such a case,

information supplied with regard to the involuntary termination program should be cumulative,

so that later terminees are provided ages and job titles or job categories, as appropriate, for all

persons in the decisional unit at the beginning of the program and all persons terminated to date.

Id.

      If a release meets the minimum standards set by the OWBPA, further inquiry is required

to decide whether the release was executed knowingly and voluntarily.  As a matter of law, the

OWBPA provides that it's requirements set only a minimum standard.  Wastak at 295 n. 8.

Legislative history states that once the minimum requirement has been met, a court may proceed

to determine whether the execution of a waiver is "knowing and voluntary."  Id. (Citing S. Rep.

No. 101-263, at 32 (1990)).  The "totality of the circumstances" approach is used by the Third

Circuit to make such a determination.  See <u>Wastak</u> at 295.

## III.  Analysis

### A. Reduction In Force

Plaintiff asserts in his Motion that he was terminated as part of a national rolling RIF, requiring Defendant to provide information about all other employees terminated as part of a national rolling RIF when providing Plaintiff with a Workforce Listing.  Plaintiff offers the Declaration of Jack Thweatt as the only evidence that Plaintiff was terminated as part of a national rolling RIF.  Although Mr. Thweatt provides firsthand knowledge of the adoption and initial implementation of the PMP, Mr. Thweatt was terminated months before Plaintiff's termination.  At this point in time there is no evidence that Mr. Thweatt has firsthand knowledge of the circumstances surrounding this specific reduction in force or of Plaintiff's termination.  As such, Mr. Thweatt's Declaration does not provide evidence that Plaintiff was terminated as part of a national rolling RIF.  Defendant produced evidence that Plaintiff was terminated as part of a specific reduction in force in 2002 by a specific Defendant organization, the Application Services Organization, for specific financial reasons.  Because the only evidence of record is that Plaintiff's termination was confined in scope and time, Defendant was not obligated to provide additional information about other earlier, separately terminated employees when providing Plaintiff with a Workplace Listing.

### B.  Termination Criteria

Plaintiff asserts that Defendant violated the OWBPA by failing to provide Plaintiff with the criteria upon which his selection for termination was based.  EEOC regulations, interpreting the OWBPA, state that when requesting a waiver in exchange for additional consideration, an

7

employer must give the terminated employee certain information about the group of individuals

with which he was terminated.  The information given must include the factors used to determine

whether a terminated employee is offered additional consideration in exchange for a valid

waiver.  The OWBPA requires a workforce listing to include the job titles and ages of all the

individuals selected to receive consideration in exchange for executing a release. 29 C.F.R.

§1625.22(f)(1) (2007).  The evidence of record establishes without genuine dispute that the

Application Services Division was the decisional unit.  The OWBPA required information only

as to the decisional unit.  The OWBPA does not require an employer to provide system wide

information, nor does it require an employer to provide the information upon which its selection

of employees for termination was based.  As such, Defendant did not violate the OWBPA by not

including this information.

**C.  Release Language**

      Plaintiff asserts that the Release is not written in a manner calculated to be understood by

the average individual eligible to participate.  Plaintiff relies upon Syverson v. International

Business Machines Corp., 461 F.3d 1147 (9th Cir. 2006)(amended January 3, 2007), for this

assertion.  In Syverson, IBM offered each terminated employee selected for termination

severance pay and certain benefits in exchange for signing a document entitled "Microelectronics

Resource Action General Release and Covenant Not to Sue" (hereinafter "MERA Agreement").

Id. at 1149.  The MERA Agreement stated that "this Release covers, but is not limited to, claims

arising from the ADEA".  Id. at 1157.  The MERA Agreement also stated that "[t]his covenant

not to sue does not apply to actions based solely under the ADEA, as amended."  Id.

      The Syverson plaintiffs' argued that the MERA Agreement was not written in a manner

calculated to be understood by the average individual eligible to participate because it misled participating employees to believe that in addition to their unaffected right to file an ADEA claim with the EEOC, they retained their right to pursue, independently, an ADEA claim in court.  Id. at 1158.  The <u>Syverson</u> plaintiffs' further argued that the language in the MERA Agreement created confusion as to whether ADEA claims were in fact covered by the release or exempted from it.  Id.  The MERA Agreement contains a release of all claims including claims arising under the ADEA, and a covenent not to sue, which includes an agreement to never institute a claim of any kind against IBM.  Id.  However, it also provides that "[t]his covenant not to sue does not apply to actions based solely under the [ADEA].  Id.  The Ninth Circuit agreed with the <u>Syverson</u> plaintiffs' and found that the MERA Agreement did not satisfy the "manner calculated" requirement of the OWBPA.  Id.

   In contrast to the MERA Agreement in <u>Syverson</u>, the instant Release provided by Defendant clearly sets out the claims released and the claims not released.  The Second section of the Release, entitled "Complete Release" states that Employee agrees to release EDS from all claims or demands Employee may have against EDS ... including, without limitation, a release of any rights or claims Employee may have under the ADEA, as amended.  The Fourth section of the Release, entitled "No Future Lawsuits" states that "Employee promises never to file a lawsuit, demand, action or otherwise assert any claims that are released in the Second paragraph of this Release (excluding a lawsuit filed by Employee solely for the purpose of challenging the validity of the [ADEA] waiver)."  Unlike in <u>Syverson</u>, the Release does not use the terms

"release"[2] and "covenant not to sue"[3] confusingly.  Moreover, the Release sets out in a separate

paragraph that Plaintiff releases his right to sue under the ADEA, except for his right to sue

solely to challenge the validity of the ADEA waiver.  Because of these distinctions, Syverson is

not persuasive in the instant case.  The instant Release was written in a manner calculated to be

understood by the average individual eligible to participate.

**D. Workforce Listing Language**

Plaintiff asserts that the Workforce Listing provided by Defendant to comply with the

OWBPA was not written in a manner calculated to be understood by the average individual

eligible to participate.  Specifically, Plaintiff asserts that he, and others similarly situated, did not

know to what the designation "Unit 312477" at the top of the Workforce Listing referred.

Defendant offered evidence that "Unit 312477" was the correct designation to describe the unit

from which Plaintiff and other employees were terminated as part of the Application Services

April 2002 Workforce Reduction.  Plaintiff now argues that said unit was headed by Joan Cox,

and that reference to Joan Cox was required.  However, it is undisputed that "Unit 312477" is the

correct designation for the decisional unit from which Defendant chose who would, or would not,

be offered the Release.  The OWBPA does not require more than the correct designation.

**E. Totality of the Circumstances**

In Wastak v. Lehigh Valley Health Network, Wastak sought to have a release invalidated

under the OWBPA.  Wastak at 283.  Specifically, he asserted that his release was invalid because

---

[2]Black's Law Dictionary defines "release" as "the act of giving up a right or claim to the person against whom it could have been enforced."  Blacks Law Dictionary 1202 (7th ed. 1999).

[3]A Covenant not to sue is a formal agreement or promise "in which a party having a right of action agrees not to assert that right in litigation."  Blacks Law Dictionary 369 (7th ed. 1999).

10

it included language providing that he not file a charge with the EEOC, and his execution of the release was not knowing and voluntary because he was unable to retain counsel to review the relevant documents, and at the time of the execution <u>Wastak</u> was suffering from "psychological trauma" due to his termination and its accompanying financial consequences.  <u>Id</u>. at 289, 294.

The Third Circuit upheld the validity of the release in <u>Wastak</u>.  <u>Id</u>. at 295.  The court reasoned that although the release seemed to conflict with 29 U.S.C. §626(f)(4),[4] there is no indication that the mere presence of that contractual language would void an otherwise knowing and voluntary waiver.  <u>Id</u>. at 290.  Moreover, the court reasoned that although Wastak did not consult with counsel before executing his release, because he understood that in return for receiving thirty-six (36) weeks of salary continuation he was agreeing not to file suit against Lehigh Valley, not being able to consult with counsel did not invalidate the release.  <u>Id</u>. at 294, 295.  Furthermore, although Wastak's claims about his fragile mental state and financial circumstances causing his inability to voluntarily sign his release should usually be decided by a jury, the Third Circuit agreed with the District Court that Wastak had not "come forth with sufficient evidence to create a genuine issue of material fact with regard to any lack of understanding or voluntariness on his part in signing the [r]elease."  <u>Id</u>. at 295.  Thus, upon consideration of the totality of the circumstances surrounding Wastak's execution of the release, the court affirmed the district court's grant of summary judgment.  <u>Id</u>.

Here, the Release satisfies the requirements of the OWBPA and there is no evidence of

---

[4]"No waiver agreement may affect the Commission's rights and responsibilities to enforce this chapter.  No waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Commission."  29 U.S.C. §626(f)(4)

circumstances that would support a finding of lack of understanding or voluntariness.

**IV. Conclusion**

For the reasons outlined above, the Release executed by Plaintiff is valid and complies with the OWBPA.  Plaintiff has not come forth with sufficient evidence to create a genuine issue of material fact with regard to any lack of understanding or voluntariness on his part in signing the Release.  Plaintiff's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.

An appropriate order follows.